UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION

| | |
|---|---|
| **ALBERT BARBER, JR., et al.,** } | |
| } | |
| **Plaintiffs,** } | |
| } | |
| v. } | Case No.: 2:13-cv-00296-RDP |
| } | |
| **TOMMY BICE, et al.** } | |
| } | |
| **Defendants.** } | |

**MEMORANDUM OPINION**

When leaders fail to lead, all types of maladies tend to follow. The reasons behind such failures are many and varied. There may be a failure to account for the critical nature of a particular crisis. Petty politics and self-interest (rather than the interests of those who should be served) may improperly motivate those tapped to lead. Officials may become stubborn, or look to the next election, not the next generation. Those in authority may be afraid to lead.[1] This case involves a failure of leadership -- occasioned by at least some of those elected to serve on the Birmingham Board of Education -- during 2012.

This matter is before the court on Defendants' Motion for Summary Judgment. (Doc. # 41). The Motion has been fully briefed. (Docs. # 42, 46, and 47).

Plaintiffs' Second Amended Complaint contains a claim under Section 2 of the Voting Rights Act of 1965, as amended, 42 U.S.C. § 1973 ("VRA") (Count Two), and claims under 42 U.S.C. § 1983 asserting violations of the Due Process and Equal Protection Clauses of the Fourteenth Amendment to the Constitution of the United States (Counts Three and Four). (Doc. # 37). Count One, which asserted claims under Section 5 of the Voting Rights Act, was

---

[1] As one popular author has said, if you want "to lead the orchestra, you have to turn your back on the crowd." http://www.quotes.net/quote/15270.

previously dismissed without prejudice, voluntarily, on Plaintiffs' own motion. (Docs. # 26, 30 and 31).

In their response to Defendants' motion for summary judgment, Plaintiffs have acknowledged that Counts Three and Four are due to be dismissed. (Doc. # 46 at 13). Therefore, the sole issue before the court is the viability of Plaintiffs' claim contained in Count Two and asserted under Section 2 of the VRA. That claim essentially asserts that, by intervening and taking over -- to some degree -- the financial management of the Birmingham public school system, Defendants diminished the power of the elected members of the Birmingham Board of Education, and thereby diluted the voting rights of those who elected the board members. (Doc. # 46 at 8-9). After careful review, the court concludes that Defendants are entitled to judgment under Federal Rule of Civil Procedure 56 on this remaining claim.

## I.   FACTS[2]

Plaintiffs are citizens and voters in the City of Birmingham, Alabama. They have filed suit against the following Defendants. Dr. Tommy Bice is the State Superintendent of Education. Dr. Ed Richardson is the acting Chief Financial Officer of the Birmingham City Schools, appointed by the State Board of Education. The Alabama State Board of Education is a constitutionally created state agency that is vested with general supervisory authority over the public schools in Alabama and the various county and city school boards. Dr. Craig Witherspoon is the Superintendent of the Birmingham City Schools.

---

[2] Unless otherwise noted, the facts of this case are taken from the Stipulations of Facts filed by the parties on June 14, 2013. (Doc. # 21). And, because the court has substantially adopted the parties' stipulations of fact as the Rule 56 facts contained in this opinion (*see* Doc. # 21), for brevity and to aid the reader, it will avoid constant citations to the parties' stipulations.

Alabama law requires that local boards of education implement certain fiscal management practices to ensure the financial soundness of the public schools of this state. Among those management practices are requirements that each local board of education (1) submit to the State Superintendent of Education a budget meeting state requirements, (2) "adopt fiscal management policies which comply with generally accepted accounting principles", and (3) develop and maintain a reserve fund sufficient to cover one month's operating expenses.

At the end of Fiscal Year 2011, Dr. Craig Pouncey, Chief Educational Financial Officer for the Alabama State Department of Education, found that 31 of Alabama's 134 local school systems did not have one month's operating expenses in reserves, as required by State law. One of those systems with inadequate reserve funds was the Birmingham City School System.

The Birmingham Board of Education's ("BBOE" or "the Board") monthly expenses in 2012 were approximately $17 million, and, at the beginning of the 2011-12 school year, it had a monthly reserve balance of approximately $6.5 million. Because of student enrollment losses, BBOE's allocation of state funds was expected to be further reduced by approximately $4.5 million. Taking this fall in revenue into account, the BBOE's actual monthly reserve balance was only approximately $2 million — about $15 million short of the monthly reserve balance required by State law. ALA. CODE § 16-13A-9 (1975).

A local school board that does not have the required reserve balance, and lacks an approved plan to build it to required levels, cannot receive State funds. As a result, it is imperative that a non-compliant board act promptly to adopt and implement a financial recovery plan.

Pursuant to his authority under the School Fiscal Accountability Act, Dr. Pouncey required each of the 31 non-compliant local school boards to submit draft recovery plans by

April 2, 2012. The draft plans were the first step in an interactive process whereby the local boards, in collaboration with Dr. Pouncey's office, would develop a unique and tailored financial recovery plan for each local board. Each financial recovery plan was required to be approved by the State Department of Education and passed as a resolution by the local school board.

In response to concerns about the unsound financial condition of the Birmingham school system, on April 12, 2012 the State Board of Education passed a Resolution for an Investigative Review of the Governance of the Birmingham Board of Education (the "April 12 Resolution"). The full text of the April 12 Resolution reads as follows:

**RESOLUTION FOR AN INVESTIGATIVE REVIEW OF THE GOVERNANCE OF THE BIRMINGHAM CITY BOARD OF EDUCATION**

**WHEREAS**, the Alabama State Superintendent of Education ("the State Superintendent") has authority under rules and regulations promulgated by the Alabama State Board of Education ("State Board") to review actions and orders of city and county boards of education and of their superintendents in matters relating to finance and otherwise seriously affecting the educational interests; and

**WHEREAS**, upon such review, the State Superintendent has the power to determine from the facts the just and proper disposition of the matter and to render binding orders with respect thereto; and

**WHEREAS**, the State Superintendent is further authorized and required to interpret and enforce the school laws, rules, and regulations of the State Board, and to decide, without expense to the parties concerned, all controversies and disputes regarding the proper administration of the public schools; and

**WHEREAS**, the Birmingham City Board of Education ("Birmingham Board") has, over the course of recent weeks and months, engaged in a pattern of decision making, action, and inaction that has impeded or prevented implementation of plans, initiatives, and programs designed to meet the Birmingham Board's financial and fiduciary obligations under state law and to ensure the provision of appropriate educational services to its 25,000 students; and

**WHEREAS**, these actions and decisions have engendered internal acrimony and paralysis, counterproductive litigation and physical altercations between Birmingham Board officials, public allegations that Birmingham Board members have violated the Alabama Open Meetings Law, and unabated,

unfavorable news media coverage; and

**WHEREAS**, these circumstances have eroded public and parental confidence in the Birmingham School System, have created and compounded community division and controversy, and have threatened to exacerbate a long-term trend of declining enrollment in the Birmingham School System; and

**WHEREAS**, Birmingham's civic, community, business, and governmental leaders, as well as members of the Birmingham Board itself, have called on the State Board to invoke its statutory authority to investigate and review the actions and decisions of the Birmingham Board that have caused the crisis of confidence described above, to implement such corrective actions as may be necessary to rectify the adverse effects thereof, and to eliminate the impediments to orderly and effective decision making that have been created thereby.

**NOW, THERFORE, BE IT RESOLVED**, By the Alabama State Board of Education as follows:

1. The State Superintendent is authorized and directed to investigate, review, and resolve by appropriate order(s) all controversies and matters described above coming under his jurisdiction by virtue of ALA. CODE §§ 16-3-27, 16-4-4, and 16-4-8 (1975), said investigation and review to be conducted in accordance with the procedures prescribed therefor in corresponding provisions of the Alabama Administrative Code.

2. In accordance with the aforementioned statutes and regulations, notice of the State Superintendent's review and investigation as well as his findings and orders based thereupon shall be provided to the State Board, the Birmingham Board, and to law enforcement authorities, if and as appropriate.

3. Nothing in this Resolution shall be construed to preclude or limit the exercise of additional supervisory, investigatory, or decision-making authority conferred on the State Superintendent or the State Board under the aforementioned statutes or regulations or any other law, including, but not limited to, education accountability legislation and corresponding state regulations.

Done this 12th day of April 2012.

Dr. Bice appointed Dr. Richardson to lead the investigative review team on behalf of the State Board of Education. Dr. Richardson formerly was the Alabama State Superintendent of Education and later served as the President of Auburn University. Dr. Richardson and his team commenced their work in Birmingham within a week of the April 12 Resolution. Throughout

April and May 2012, Dr. Witherspoon and his staff, *some* of the members of the BBOE, and Dr. Pouncey and his staff worked diligently to create a Financial Recovery Plan that could be approved. Dr. Pouncey met with the BBOE on April 18 and 24, and May 21, 2012, in order to discuss the specifics of the Financial Recovery Plan.

By May 31, 2012, a Financial Recovery Plan was presented to the BBOE for its consideration. Drs. Witherspoon and Pouncey jointly presented the Plan to the Board, and pointed to various ways in which the Board could reduce its operating expenses, including the closure of certain schools and the reduction of the number of non-certified support employees.[3] Taking these actions would allow the BBOE to establish, over time, the statutorily required $17 million reserve fund without diminishing the Board's educational mission. The proposed Financial Recovery Plan was to be implemented over two years, with $13 to $14 million in savings occurring during the 2012-13 school year, and the balance of the needed savings to be realized in the 2013-14 school year.

A special called BBOE meeting was scheduled for June 5, 2012, to consider and act upon the proposed Financial Recovery Plan. At the meeting, Dr. Witherspoon recommended that the

---

[3] When compared to school systems with a similar student population, it is readily apparent that, in 2012, the Birmingham system was carrying a much heavier load of support personnel. This led Judge Brown to note, in a decision he authored in litigation pending before him (and which is discussed in more detail *infra*), that "[t]he operating costs of the Birmingham School System are considerably out of line." (Doc. # 43-2 at 4). For example, the record reveals the following:

● Shelby County, with 28,432 students, employs 622 support personnel (a ratio of 46:1). Montgomery County has 915 support personnel for its 31,368 students (a ratio of 34:1). On the other hand, the Birmingham City School System has 1,020 support personnel for 25,005 students (a ratio of 25:1).

● Each Shelby County coordinator/director/supervisor/manager ("director") serves 125 students, while each Madison County director serves 146 students. Each Montgomery County director serves 36 students. But in Birmingham, there is a director for every 20 students.

● Birmingham pays $855.00 per student in operations and maintenance costs, while similar costs for each Shelby County student is $622.00, and for each Montgomery County student is $400.19.

(Doc. # 43-2 at 5, Findings of Fact in Jefferson County Circuit Court cases *Witherspoon v. Drew*, No. CV-2012-936-HLB, and *Alabama Bd. of Educ. v. Birmingham Bd. of Educ., et al.*, No. CV-2012-902271- EAF).

BBOE adopt the Financial Recovery Plan. However, while the BBOE voted on the plan, it did not adopt it, and, quite perplexingly, did not propose any alternative.

On June 12, 2013, the BBOE held its next regular meeting. At this meeting, all of the BBOE members present voted to adopt the Financial Recovery Plan. Even so, the Financial Recovery Plan adopted by the BBOE did not include details for its implementation — *i.e.*, it did not identify the specific individuals who would be affected by the Financial Recovery Plan's reduction in force.  There was no agreement about how to implement the plan.

On June 14, 2012, the State Board of Education passed a resolution regarding the Birmingham City Schools. The full text of the resolution reads:

**State Board of Education Resolution**
**Birmingham City Schools**

> **WHEREAS**, the Alabama State Board of Education and the State Superintendent of Education are vested by the Alabama Constitution and the laws of the state of Alabama with authority to exercise general control and supervision over the public schools of the State; and
>
> **WHEREAS**, Alabama law further authorizes the State Superintendent of Education to review actions and orders of boards and superintendents of education in matters relating to finance and other matters seriously affecting the education interest, to enforce the education laws and regulations of the Alabama State Board of Education, and to implement the educational policy of the Alabama State Board of Education; and
>
> **WHEREAS**, local boards of education perform a state function at a local level and function as an arm of the state, subject to the general supervision of the Alabama State Board of Education; and
>
> **WHEREAS**, the Code of Alabama, including the Education Accountability provisions thereof, empowers the Alabama State Board of Education to assume the primary responsibility for execution of the state function of providing public education when a city or county board of education fails in its responsibility to satisfactorily provide it and to assume responsibility for the daily operations and management of a local board of education when the Board is either academically or financially deficient; and

7

**WHEREAS**, more particularly, Alabama law specifically provides for intervention by the State Superintendent of Education of local boards of education failing to meet state financial standards and requirements; and

**WHEREAS**, pursuant to Alabama law, the State Department of Education analyzed the financial integrity of the Birmingham City Board of Education and determined, among other things, that the Birmingham City Board of Education was the only school system in the state of Alabama that failed to meet the deadline of May 27, 2012, for submitting a financial accountability plan; that the Birmingham City Board of Education had failed to maintain or develop a plan for maintaining the reserve fund required by Alabama law; and that the Birmingham City Board of Education had insufficient funds available to make up for the drop in state funding resulting from a decrease in student enrollment; and

**WHEREAS**, the Birmingham City Board of Education has failed to meet its fiscal responsibility as established through the Education Accountability laws and has allowed an unsound financial condition to be created and perpetuated in said system; and

**WHEREAS**, pursuant to Alabama law, the State Department of Education has provided direct, on-site assistance and advice to the Birmingham City Board of Education in the area of financial and fiscal management over the past several years and most recently due to the Birmingham City Board of Education's failure to develop the required financial plan; and

**WHEREAS**, as part of that assistance and advice, the State Department of Education collaboratively developed and proposed a Financial Recovery Plan, which was discussed with the Birmingham Board of Education on no less than three occasions, and requested input from the members of the Birmingham City Board of Education; and

**WHEREAS**, at its meeting on June 5, 2012, the Birmingham City Board of Education summarily rejected said plan, without articulating an alternative for achieving financial recovery at that time; and

**WHEREAS**, the Birmingham City Board of Education, at its meeting on June 12, 2012, did in fact adopt a modified Financial Recovery Plan; and

**WHEREAS**, the Alabama State Board of Education finds and determines that immediate implementation of the adopted plan is necessary, both to the restoration of fiscal stability to the Board and to prepare for the beginning of the 2012-2013 school year, and that continuous assistance by a person or persons appointed by the State Superintendent is essential to that end; and

**WHEREAS**, due to the lack of a plan for implementation of the approved Financial Recovery Plan, exigent circumstances now exist affecting the education

and educational interests of the Birmingham City Board of Education:

**NOW, THEREFORE, BE IT RESOLVED**, That the Alabama State Board of Education does authorize the State Superintendent of Education to appoint a person or persons to provide on-site oversight of the day-to-day operations of the Birmingham City Board of Education, specifically to advise and assist with the Birmingham City Board of Education's implementation of the approved Financial Recovery Plan, with all direct and indirect personnel actions associated with the Plan to be presented for state review no later than Friday, June 22, 2012, and to be approved by the Birmingham City Board of Education at its regularly scheduled meeting on Tuesday, June 26, 2012; and

**BE IT FURTHER RESOLVED**, That in the event that the approved Plan is not implemented in accordance herewith, the Alabama State Board of Education does hereby approve the request of the State Superintendent of Education to intervene into and assume direct control of the fiscal operation of the Birmingham City Board of Education; and

**BE IT FURTHER RESOLVED**, That within this intervention process, the State Superintendent of Education shall present this Board with a proposal for the implementation of management controls necessary to restore the Birmingham City Board of Education to a sound financial condition, and shall further appoint a Chief Financial Officer to manage the financial operations of the Birmingham City Board of Education and make associated recommendations to the State Superintendent of Education as necessary to restore the Birmingham City Board of Education to a sound financial condition.

Done this 14th day of June 2012.

Notwithstanding the State Board of Education's express direction that the BBOE approve the implementation phase of its Financial Recovery Plan "at its regularly scheduled meeting on Tuesday, June 26, 2012," the BBOE again failed to do so.

The Birmingham Board, in defiance of the State Board of Education's authority (Doc. # 43-2 at 18), failed to meet the State Board of Education's deadline for implementation of the Financial Recovery Plan. That refusal triggered the relevant provisions of the June 14 resolution and operated to confer full authority on Dr. Bice to (1) "intervene into and assume direct control of the fiscal operation of the Birmingham City Board of Education," (2) to "appoint a Chief Financial Officer to manage the financial operations of the Birmingham City Board of Education

and to make associated recommendations to the State Superintendent of Education as necessary to restore the Birmingham City Board of Education to a sound financial condition," and (3) to "present to the State Board of Education a proposal for the implementation of management controls necessary to restore the Birmingham City School Board of Education to a sound financial condition."

On June 28, 2012, Dr. Bice presented the State Board of Education with a Plan for Implementation of Management Controls (the "Implementation Plan"). Among other things, the Implementation Plan provided for the appointment of Dr. Richardson to serve as Chief Financial Officer for the Birmingham Board with full authority to manage the financial operations of the Birmingham Board. Dr. Richardson heads the State's "intervention team." The State Board of Education voted unanimously to approve the Implementation Plan, and expressed to Dr. Bice their unified support for the recommendations presented.

By July 24, 2012, the BBOE still had not adopted a concrete plan to implement the Financial Recovery Plan, even though it had agreed to the general provisions of such a plan one month before. On that date, Dr. Bice presided at a called meeting of the Board. Only six members of the BBOE (including Plaintiffs Ford and Volker) attended. Three members of the Birmingham Board were absent. Dr. Witherspoon recommended that the BBOE approve the personnel actions necessary for implementation of the Financial Recovery Plan. The Board again failed to adopt *any* plan to implement the Financial Recovery Plan or otherwise deal with the school system's serious financial plight. The vote on the motion was as follows: YEAS: 2 (Maye and Wyne); NAYS: 2 (Belcher and Ford); ABSTAINED: 2 (Maddox and Volker). Of the 31 school districts which initially were determined not to have sufficient operating expenses in reserves, Birmingham was the only one "which failed in its obligation to submit a Financial

Recovery Plan to the [State Board of Education] by May 31, 2012." (Doc. # 43-2 at 17). Thus, the implementation phase of the Plan was not approved. Accordingly, Dr. Bice overrode the vote and approved the implementation of the Financial Recovery Plan stating, "In the absence of a vote, I here exercise my authority, acting at the direction of the State Board of Education, pursuant to Alabama Code Section 16-6B-4 and other applicable law and approve the recommended action."

The controversy over the BBOE's failure to act and the State Board of Education's intervention led to litigation in state court before the Hon. Houston Brown, Jefferson County Circuit Judge. On August 13, 2012, Judge Brown entered findings of fact, conclusions of law, and a final judgment and permanent injunction in the consolidated cases of *Witherspoon v. Drew*, No. CV-2012-936-HLB, and *Alabama Bd. of Educ. v. Birmingham Bd. of Educ., et al.*, No. CV-2012-902271-EAF. Judge Brown's Findings of Fact and Conclusions of Law (Docs. # 43-2 and 43-3) are highly instructive and provide detailed information which puts the 2012 showdown between the State Board of Education and the BBOE in context. The court attaches his Findings of Fact to this memorandum opinion.

In his judgment, Judge Brown concluded, as a matter of law, that "intervention has properly been invoked by the STATE BOARD OF EDUCATION and State Superintendent BICE and is a valid, reasonable, and necessary exercise of their general supervisory powers over the statewide system of education and, in particular, the authority granted to them under ALA. CODE § 16-6B-4." In his Findings of Fact, Judge Brown specifically found that, "Unless abated, the governance issues posed by [five of the] members of the BBOE may well jeopardize the district accreditation of the Birmingham School System. The denial of such accreditation would be devastating, *specifically to the children* served by the Birmingham School System and

11

to the City of Birmingham generally." (Doc. # 43-2 at 26) (Emphasis added).

Judge Brown further found that, "If Birmingham schools were to lose their accreditation, Birmingham high school graduates would be ineligible for various college scholarships, loans, and grants. They would be denied admission to many of the nation's better institutions of higher learning. Effectively, if the Birmingham City Schools are not accredited, many of its students will be ineligible and unable to go to college."[4] Judge Brown also found that, if Dr. Bice had not overridden the BBOE's inaction on a Financial Recovery Plan, as of September 15, 2012, state and federal funds for the operation of Birmingham City Schools would likely have been withheld. The loss of these funds would have shut down the operation of the Birmingham School system. (Doc. #43-2 at 6).

The undisputed evidence contained in the Rule 56 record makes clear that while some members of the Board abdicated their responsibility to manage the finances of the school system, the State did not assume all powers and responsibilities of the Board. Indeed, even after Dr. Bice assumed direct control over the financial affairs of the Birmingham Board of Education, the elected members of the BBOE continued to exercise all of their other powers, and in the course of doing so, have approved hundreds of matters without interference from State officials. By way of example, the BBOE has (1) unanimously approved the Fiscal Year 2012-2013 Budget, (2) approved various legal settlements, (3) approved payments for Advanced Placement exams, (4)

---

[4] Judge Brown also concluded that, while "Governance and Leadership … is the second most important of the five accreditation factors," a

> [l]ack of governance and stability have long plagued the Birmingham School System. In the last twelve (12) years, the Birmingham School System has employed five (5) superintendents. The superintendent turn-over rate for Birmingham School System is the highest in the State. This lack of stability in leadership has a direct relationship to the financial condition of the Birmingham School system. It adversely affects public confidence in the system. A new superintendent would have difficulty in implementing a financial recovery plan as required by the SBOE.

(Doc. #43-2 at 4) (citations omitted).

12

approved acquisition of various office equipment, (5) approved contracts with various educational providers, (6) approved purchases of various software and support, (7) approved installation of network cabling and purchase of various networking equipment, (8) approved acquisition of a bus GPS system in the amount of $357,036.00, (9) approved purchases of various textbooks and other instructional materials and support, approved purchases of "electronic white boards" in the amount of $416,451.27, (10) approved various building repairs and upgrades, (11) approved various personnel actions, (12) approved the purchase or condemnation of real property and associated services, (13) approved the purchase of iPads, MacBooks, and other computers, (14) approved revisions to its Policy Manual, (15) approved procedures and decisions for filling two Board vacancies, (16) elected two of its own members as President and Vice-President, (17) approved revisions to the Student Code of Conduct, (18) extended the Superintendent's contract for two years, (19) approved the purchase of 25 new school buses, at a cost of up to $2,300,000.00, and (20) approved the sale of surplus real property in the amount of $665,000.00.

However, Dr. Richardson has overridden certain votes of Birmingham Board of Education. For example, on February 12, 2013, Dr. Richardson overrode a majority vote of the Board and approved a contract with a company called Cenergistic. On May 7, 2013, Dr. Richardson overturned a unanimous 9-0 Board decision to reject Supt. Witherspoon's proposal to consolidate Norwood Elementary School into Lewis Elementary School. On May 7, 2013, after there was a 4-4 vote of the Board, Dr. Richardson approved the recommendation of Supt. Witherspoon to consolidate Jackson Elementary School into Hemphill Elementary School. Dr. Richardson ordered that the recommendation be shown as approved. And, on June 11, 2013, Dr. Richardson overrode the BBOE vote against spending $750,000 for maintenance and work to

prepare Lewis Elementary and another school for more students in the fall. These are the only votes in which State officials have overridden a vote of the BBOE since intervention began.

Finally, the parties have stipulated that according to the U.S. Census Bureau: State and County QuickFacts (2010 Census), the majority (73.4%) of the 212,237 population of Birmingham is black. The majority (70.1%) of the 4,779,736 population in Alabama is white. The State Board of Education has nine members; seven are white and two are black. The Birmingham Board has nine members; two are white and seven are black.

## II.     STANDARD OF REVIEW

Under Federal Rule of Civil Procedure 56(c), summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). The party asking for summary judgment always bears the initial responsibility of informing the court of the basis for its motion and identifying those portions of the pleadings or filings which it believes demonstrate the absence of a genuine issue of material fact. *Celotex*, 477 U.S. at 323. Once the moving party has met its burden, Rule 56(e) requires the non-moving party to go beyond the pleadings and by her own affidavits, or by the depositions, answers to interrogatories, and admissions on file, designate specific facts showing that there is a genuine issue for trial. *See* id. at 324.

The substantive law will identify which facts are material and which are irrelevant. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). All reasonable doubts about the facts and all justifiable inferences are resolved in favor of the non-movant. *See Fitzpatrick v. City of Atlanta*, 2 F.3d 1112, 1115 (11th Cir. 1993). A dispute is genuine "if the evidence is such that a

reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248. If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted. *See id.* 249.

## III. ANALYSIS

After careful review and for the reasons stated below, the court concludes that there are no material issues of fact in this case and that Defendants are entitled to judgment as a matter of law. *See* Fed.R.Civ.P. 56.

Section 2 of the Voting Rights Act bans "all States and their political subdivisions from maintaining any voting 'standard, practice, or procedure' that 'results in a denial or abridgement of the right ... to vote on account of race or color.'" *Reno v. Bossier Parish Sch. Bd.*, 520 U.S. 471, 479 (1997) (quoting 42 U.S .C. § 1973(a) (emphasis omitted)). Section 2 "does not deal with every voting standard, practice, or procedure, but rather is limited to voting procedures that deny someone the right to vote." *Dougherty Cnty., Ga., Bd. of Ed. v. White*, 439 U.S. 32, 50 n. 4, (1978). To prevail, a plaintiff must demonstrate that "based on the totality of the circumstances, ... the political processes leading to ... election ... are not equally open to participation by [minority groups] ... in that its members have less opportunity than other members of the electorate to participate in the political process and to elect representatives of their choice." 42 U.S.C. § 1973(b).

Defendants make two primary arguments in support of their Motion: First, they argue that the Supreme Court's decision in *Presley v. Etowah County Commission*, 502 U.S. 491 (1992), establishes that State intervention in the financial affairs of the Birmingham City Schools is not a voting-related practice that falls within the reach of the VRA. Second, they argue that, even if intervention were a voting standard, practice, or procedure regulated by § 2, Plaintiffs could not

show that intervention adversely affected minority voters' ability to participate in the political process on equal grounds with other voters. (Doc. # 42 at 16-17).

Plaintiffs assert that Defendants' actions affect their voting rights because the Board has been replaced by appointed officials. (Doc. # 46 at 8-9). Although Plaintiffs acknowledge that the Board has continued to decide many matters, they argue that the State Board of education effectively substituted Drs. Bice and Richardson for the Board because they have the authority to override any vote. (Doc. # 46 at 10).

Although the *Presley* decision addressed the scope of § 5 of the Voting Rights Act, its analysis applies to § 2 because the *Presley* opinion addressed the definition and meaning of this phrase that is embodied in both § 2 and § 5: "voting qualification or prerequisite to voting, or standard, practice, or procedure" with respect to voting. *Compare* 42 U.S.C. § 1973(a) *with* 42 U.S.C. § 1973c. *See Morse v. Republican Party of Va.*, 517 U.S. 186, 209 (1996) (Stevens, J.) ("[C]hanges in practices within covered jurisdictions that would be potentially objectionable under § 2 are also covered under § 5."); *Holder v. Hall*, 512 U.S. 874, 882 (1994) (Kennedy, J.) ("[T]he coverage of §§ 2 and 5 is presumed to be the same."); *Bonilla v. City Council of City of Chi.*, 809 F.Supp. 590, 596 n. 3 (N.D. Ill. 1992) (noting that "[a]lthough *Presley* technically dealt with the scope of § 5 ..., it is equally applicable to § 2 because *Presley* defined the key terms in both sections").

Chief Judge Watkins of the Middle District of Alabama recently summarized the *Presley* decision as follows:

> In *Presley*, the Supreme Court held that § 5 applies only to a change in a "standard practice or procedure" that has a "direct relation to, or impact on, voting." 502 U.S. at 506. The Court observed that it had recognized four types of changes that meet the "direct relation" test: Those that (1) "involved the manner of voting"; (2) "involve[d] candidacy requirements and qualifications"; (3) "concerned changes in the composition of the electorate that may vote for

candidates for a given office" or (4) "affect[ed] the creation or abolition of an elective office." *Id.* at 502-03. "The first three categories involve changes in election procedures, while all the examples within the fourth category might be termed substantive changes as to which offices are elective." *Id.* at 503. Presley distinguished between changes in a standard, practice, or procedure directly affecting voting by the electorate and "changes in the routine organization and functioning of government." *Id*. at 504. While the latter changes may indirectly affect voting, they are not within the scope of § 5.

The *Presley* plaintiffs argued that a transfer of duties among and away from elected officials pertaining to repairs and discretionary spending for road maintenance within two Alabama county commissions constituted "changes" that had a direct relation to voting and, thus, required preclearance. *See id.* at 493. The first alleged change took away the commissioners' discretion to allocate funds as needed in their districts and instead put all funds in a common account to be doled out based upon needs of the county as a whole. The second alleged change, which occurred within another county commission, transferred authority concerning road and bridge operations from the elected county commissioners to an appointed county engineer who answered to the commission. *See id*. at 497–99.

The Supreme Court held that these changes did not fit within any of the four categories it had previously recognized as having a direct relation to voting. *See id*. at 503-08. The first alleged § 5 change "concern[ed] the internal operations of an elected body." *Id.* at 503. "Changes which affect only the distribution of power among officials are not subject to § 5 because such changes have no direct relation to, or impact on, voting." *Id.* at 506. The other alleged § 5 change also did not require preclearance because even if "the delegation of authority to an appointed official is similar to the replacement of an elected official with an appointed one" (fourth category), it did not "change[ ] an elective office to an appointive one." *Id.* at 506-07. Both before and after the change, the county voters could elect their county commissioners. And while the change resulted in a shift in the balance of authority through the creation of an appointed post, the commission "retain[ed] substantial authority, including the power to appoint the county engineer and to set his or her budget." *Id.* at 508. The Supreme Court concluded:

> Covered changes must bear a direct relation to voting itself. That direct relation is absent in both cases now before us. The changes in [the two county commissions] affected only the allocation of power among governmental officials. They had no impact on the substantive question whether a particular office would be elective or the procedural question how an election would be conducted. Neither change involves a new "voting qualification or prerequisite to voting, or standard, practice, or procedure with respect to voting." 42 U.S.C. § 1973c.

*Id.* at 510.

*Ford v. Strange*, 2013 WL 6804191 *12-13 (M.D. Ala. 2013). The court adopts Judge Watkins's well-reasoned analysis of *Presley* as its own.

The facts of this case fall squarely within the holding of *Presley*. Here, the State Board intervened to ensure that the Birmingham Board effectively managed its financial affairs, a responsibility that the BBOE collectively was not meeting of its own accord. The stipulated facts demonstrate not only that the Birmingham Board continued to be comprised of the nine members elected by Birmingham voters, but also that the Board still conducted business as usual on non-financial matters, as well as on financial ones — at least when it acted in a fiscally responsible manner in doing so. Upon intervention, when the Board did not act responsibly in financial matters, its votes were subject to being overridden. But the parties have stipulated that such overrides have occurred on only four occasions. Although Plaintiffs argue that Drs. Bice and Richardson have been "substituted" for the Birmingham Board, the undisputed Rule 56 facts do not support that contention. Birmingham voters' ability to vote for and elect the Birmingham Board of Education has not been hindered in any way. "Changes which affect only the distribution of power among officials are not subject to § [2] because such changes have no direct relation to, or impact on, voting." *Presley,* 502 U.S. at 506.

Nor do the stipulated facts suggest that the Board has lost "substantial authority" as a result of the state's intervention. *Id.* at 508. In *Presley*, because the commission retained its "substantial authority," there was not a de facto replacement of an elected office with an appointed one. *See id.* (noting that the "Russell County Commission retains substantial authority, including the power to appoint the county engineer and to set his or her budget"). Here, too, the Birmingham Board retained its substantial authority. Because nothing more than the distribution

of power among elected officials on certain critical financial issues is at issue in this case, just as in *Presley*, the facts simply do not implicate the VRA.

## IV.  CONCLUSION

In this case, the State Board of Education was presented with a school system teetering on ruin.  It was facing financial collapse and loss of accreditation.  A dysfunctional school board, being led by several Pied Pipers, was marching inexorably toward a vast abyss.  The State Board of Education properly intervened and, in doing so, did not violate any voter's rights under § 2 of the VRA.  For the foregoing reasons, Defendants are entitled to judgment as a matter of law on Plaintiffs' remaining claim under Section 2 of the VRA and Defendant's Motion for Summary Judgment is due to be granted.  A separate order will be entered.

**DONE** and **ORDERED** this August 29, 2014.

_____
**R. DAVID PROCTOR**
UNITED STATES DISTRICT JUDGE